**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| KARINA HERNÁNDEZ ALCAZAR, for herself and in representation of the minor K.M.H.; <br><br> Plaintiffs; <br><br> v. <br><br> MENNONITE GENERAL HOSPITAL INC. DBA HOSPITAL MENONITA AIBONITO; THE MEDICAL PROTECTIVE COMPANY; DR. CARLENE MARIE CÁDIZ FUENTES, SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DE SEGURO DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA ("SIMED"); PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY ("PRMD"); ABC INSURANCE COMPANY, JOHN DOE, RICHARD ROE, CONJUGAL PARTNERSHIPS I-X <br><br><br> Defendants. | Civil No.: 23-1182 <br><br><br><br> RE: TORT ACTION FOR MEDICAL MALPRACTICE PURSUANT TO ARTS. 1536 AND 1541, 31 P. R. Laws Ann. §§ 1080 AND 10806 <br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

**TO THE HONORABLE COURT**:

     **APPEAR NOW** the Plaintiffs, KARINA HERNÁNDEZ ALCAZAR, for herself

and in representation of her minor child K.M.H. (hereinafter referred to as "Plaintiff"),

through the undersigned counsel, and hereby state, allege, and request as follows:

**JURISDICTIONAL BASIS**

1.     This case is based upon diversity jurisdiction under 28 U.S.C. §1332.

2.     Plaintiff is domiciled in and is a resident of the state of Florida.

3.  All Defendants are either individuals who reside in Puerto Rico or corporations organized under the laws of the Commonwealth of Puerto Rico with their principal place of business in P.R. or of states other than Florida.

4.  The matter in controversy exceeds the sum of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00), exclusive of interest and costs, thus vesting jurisdiction on this Honorable Court pursuant to 28 U.S.C. § 1332.

5.  Venue is proper in the District of Puerto Rico pursuant to 28 U.S.C. §1391, since the events and acts or omissions giving rise to this claim occurred in this district.

## THE PARTIES

6.  The co-plaintiff, **KARINA CRISTAL HERNÁNDEZ ALCAZAR**, (hereinafter "Karina Hernandez", "Karina", "mother") is 21 years old, single, and resident of Florida, with postal address of 8814 Aruba Ln Port Richey FL 34668.

7.  Co-defendant **MENNONITE GENERAL HOSPITAL, INC.** (hereinafter **"MGH"** or **"hospital"**), is a corporation duly incorporated and registered in and with its principal place of business in Puerto Rico. It's office address being CARR. 14 KM. 12.1, Barrio Rincon, Sector Lomas Cayey, PR 00737.

8.  Co-Defendant **MGH** owns and/or operates hospitals in Puerto Rico, located in Aibonito (hereinafter "**MHA**") and Cayey, (hereinafter "MHC"), wherein it provides its patients with a gamut of hospital services and/or hospital care, including birthing services, nursing, nursery, ICU, emergency, surgery, internal medicine, PACU, NICU, laboratory and other hospital care and services.

9.  Co-defendant **THE MEDICAL PROTECTIVE COMPANY** (hereinafter "**MedPro**") is the marketing and administrator of the insurance policies

underwritten by the Medical Protective Company and/or National Fire and Marine Insurance Company, and insured Mennonite Hospital Aibonito (MHA) for the acts alleged in this complaint.

10. Co-defendant **DR. CARLENE CÁDIZ FUENTES**, (hereinafter "Dr. Cadiz") of age, doctor in medicine and resident of Puerto Rico. The doctor works out of her office in Bo. Caonillas 726 José L. Vázquez, Aibonito, PR.

11. Co-Defendant **Sindicato de Aseguradores para la Suscripción Conjunta de Seguro de Responsabilidad Profesional Médico-Hospitalaria** (hereinafter, "**SIMED**") is an insurance company organized, existing, and with its principal place of business in Puerto Rico or a state other than Florida which issued insurance policies for medical malpractice on behalf of one or more of the physician Co-Defendants Joint Tortfeasors in this case, for the acts and/or omissions described herein, encompassing the relevant period of time.

12. Co-Defendant **PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY** (hereinafter "**PRMD**") is an insurance company organized, existing, and with its principal place of business in Puerto Rico or a state other than Florida which issued insurance policies for medical malpractice on behalf of one or more of the physician Co-Defendants Joint Tortfeasors in this case, for the acts and/or omissions described herein, encompassing the relevant period of time.

13. Pursuant to 26 P.R. Laws Ann. § 2001, a direct action may be brought in the Commonwealth of Puerto Rico against a casualty or liability insurance carrier for the negligence or fault of its insured.

14. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined with an action against its insured.

15. Co-defendant **INSURANCE COMPANY A, B, C,** are unknown insurance providers authorized to make business under the laws of the Commonwealth of Puerto Rico, named herein, to be later replaced by their actual names which may become known through further discovery in this litigation, and who may be liable to the plaintiffs., in whole or in part, for the actions and/or omissions herein described, encompassing the relevant period of time, and the damages suffered by the plaintiffs.

16. Co-Defendants unknown joint tortfeasors **JOHN DOE** and **RICHARD ROE** are physicians or other health care providers fictitiously named herein, to be later replaced by their actual names which may become known through further discovery in this litigation, and who may be liable to the plaintiffs, in whole or in part, for the actions and/or omissions herein described, encompassing the relevant period of time, and the damages suffered by the plaintiffs.

17. Co-Defendants **CONJUGAL PARTNERSHIPS I-X** are unknown conjugal partnerships comprised of the individual defendants and their respective husbands and/or wives, who are currently unknown.

18. Pursuant to 26 P.R. Laws Ann. § 2001, a direct action may be brought in the Commonwealth of Puerto Rico against a casualty or liability insurance carrier for the negligence or fault of its insured.

19. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined with an action against its insured.

## GENERAL ALLEGATIONS

20. **KARINA HERNÁNDEZ ALCAZAR** was a pregnant woman of 19 years of age who received prenatal care at the medical office of obstetric gynecologist **DR. CARLENE CÁDIZ**.

21. Karina took good take care of herself during her pregnancy and attended her follow-up appointments.

22. Dr. Cadiz's visit with Karina were always very brief and lacked a thorough and detailed consultation or examination.

23. Karina's pregnancy had been normal, without complications, and the baby was healthy during the pregnancy.

24. At eight months of pregnancy, Dr. Cádiz completed Karina's last sonogram and indicated to her that the baby was correctly positioned for the birth and that everything was normal and going well.

25. During her last week of pregnancy, due to the baby's large size, Karina suffered pain in her hips and had to use crutches to walk.

26. Karina, along with Dr. Cadiz, had decided for a scheduled induction on February 22, 2021.

27. Dr. Cadiz failed to warn Karina of the potential risks an elective induction of labor would entail, use of Cytotec or the use of vacuum for extraction.

28. Dr. Cadiz did not document in the medical record the risks and benefits of a scheduled induction.

29. On the 22nd of February, Karina went to **MENNONITE GENERAL HOSPITAL** in Aibonito as previously programmed.

30. Karina was admitted February 22nd, 2021 at 6:00 am, under the care of Dr. Cádiz.

31. Dr. Cadiz ordered the administration of medication Cytotec to induce the birth on at least two occasions.

32. During the process, a rubber ball was placed on Karina's uterus to be able to reach the centimeters necessary to start the birth.

33. After this, the nurses told Karina on two occasions during the birthing process, which took more than twenty (20) hours, that she should shower and walk around while she was able to reach the centimeters necessary to start the birthing process.

34. After many hours of active labor and pain, Karina was exhausted and requested on multiple occasions that she have the baby via cesarean section, these were ignored by nurses and Dr. Cadiz.

35. The nurses were often absent and/or were not paying attention to the mother nor the baby.

36. Dr. Cadiz also was absent for long periods and was not paying attention to the mother or the baby during the longs hours before the birth.

37. Even though hours passed without the birth of the child, Dr. Cádiz kept insisting that Karina have the baby through natural birth.

38. After many hours of excruciating labor, Dr. Cadiz came into the room and asked Karina whether she wanted her to use a vacuum to deliver K.M.H.

39. Dr. Cadiz showed Karina the vacuum device but never explained the risks and benefits of using the vacuum to deliver the baby.

40. Dr. Cadiz did not mention the possibility of a C-section and the risks and benefits of the same were not discussed either.

41. Dr. Cadiz never gave Karina an option that was not a vacuum delivery.

42. More importantly, Dr. Cadiz did not explain to Karina that cephalohematoma is a risk in vacuum assisted deliveries.

43. Karina was not provided any information nor a written consent form for a vacuum delivery.

44. Karina, utterly exhausted, in agony and desperate to have her baby, told Dr. Cadiz that she could proceed to use the vacuum without knowing the potential consequences.

45. Dr. Cádiz used a vacuum on the baby's head to extract the baby from the vaginal canal.

46. Dr. Cadiz's first attempt to use vacuum extraction on baby's head did not succeed.

47. Dr. Cadiz used the vacuum extraction on the baby's head a second time before he was extracted.

48. When baby K.M.H. was extracted, he did not cry, but had a purple cyanotic appearance and was hypoactive.

49. The baby was born measuring twenty one (21) inches and weighing eight (8) pounds and three (3) ounces.

50. After various minutes of silence, the baby started to cry.

51. The APGAR score given to K.M.H. by Dr. Cadiz did not coincide with the baby's clinical picture.

52. According to MGH's medical record pediatrician Dr. Jesus A. Zayas Burgos was not in MGH premises when the baby was born, hence there was no pediatrician available to receive the baby when he was born.

53. Although the labor process had been long and complicated, neither Dr. Cadiz, nor the hospital personnel ensured that a pediatrician and/or neonatologist be present for the extraction of the baby by vacuum.

54. Upon being extracted, K.M.H. was poorly resuscitated and stabilized due to the absence of a pediatrician and/or duly trained personnel at the time of delivery.

55. K.M.H. was described in medical record as having a poor cry, "lethargic, in distress, somnolent with stridor and cyanotic."

56. Eventually, an emergency doctor, Dr. Maribel Rivera, was summoned to help with the baby's resuscitation.

57. Unfortunately, and according to the record, more than six (6) minutes of critical time had elapsed from the time baby K.M.H. was extracted at 9:17 am and Dr. Rivera's arrival at 9:23 am.

58. When K.M.H arrived at the Aibonito hospital's nursery, he was described as "hypoactive, whiny, having respiratory difficulty, saturating at 89%, with abnormal retractions and having nasal flaring; cold to touch, with cyanosis of limbs."

59. K.M.H.'s head exam described a high caput with a large cephalohematoma.

60. K.M.H.'s respiratory exam showed crackles, rhonchi and stridor.

61. K.M.H.'s neurosensory exam described the baby as depressed.

62. K.M.H. is also described as lacking Moro, Suck, Babisnki and patellar reflexes.

63. According to MGH's record, K.M.H. was admitted to Mennonite Aibonito nursery on February 23, 2021, at 9:17 am and was discharged on that same day at 11:55 am.

64. Dr. Jesus Zayas in his Transfer Note from HMA to HMC NICU describes baby K.M.H. with a diagnostic impression of metabolic acidemia and at moment of transfer in critical condition with a disoriented consciousness.

65. Karina was not provided any information as to the condition of her baby K.M.H. by Dr. Cadiz, she was told that protocol required the baby's transfer to Mennonite Cayey's NICU unit.

66. K.M.H. was transferred to Hospital Menonita Cayey's NICU.

67. K.M.H.'s transfer was done while he was unstable, without correcting his acidosis, hypoglycemia or stabilizing him from a ventilatory point of view.

68. Karina's baby, K.M.H., was admitted to the Mennonite Cayey Hospital with neonatal depression, metabolic acidosis, and respiratory difficulty.

69. K.M.H. was intubated, given cold therapy, administered many different medications, and multiple studies, including a head CT and a sonogram.

70. K.M.H.'s labs showed elevated liver enzymes, proteinuria, hematuria, glucosuria and lactic acidosis compatible with hypoxic effects.

71. K.M.H.'s physical exam showed increased tonicity of the left arm and a large right parieto-occipital cephalohematoma with skin erythema.

72. Head CT scan performed on February 24, 2021, showed that K.M.H. had acute intraparenchymal hemorrhage.

73. A few days later, Karina was discharged from Hospital Menonita de Aibonito, Karina arrived at Menonita Cayey and in the NICU unit she was notified that the baby K.M.H. was having convulsions.

74. K.M.H. was discharged from the Cayey Mennonite hospital with a diagnosis of neonatal depression, convulsions, and intraparenquimatosa hemorrhaging and transferred to HIMA hospital in Caguas.

75. At HIMA's NICU K.M.H was evaluated by a hematologist and pediatric cardiologist, he also required EEG monitoring and a pediatric neurologist, among other specialists.

76. HIMA record shows there was evidence of multi-organ failure, following a hypoxic-ischemic insult.

77. HIMA's records reflect a final diagnosis of status post cooling, acute kidney insufficiency (AKI), respiratory distress syndrome (RSD), Hypoxic Ischemic Encephalopathy (HIE), epilepsy, seizures, Intracranial Hemorrhage- right frontal lobe (ICH), among other conditions.

78. HIMA records note that the baby was "affected by vacuum delivery".

79. After multiple weeks, the baby was finally discharged from HIMA Caguas on March 30, 2021, with medications for epilepsy (Luminal and Keppra) and advised to consult multiple pediatric subspecialists.

80. Since then, Karina has had to visit multiple specialists of every type, such as neurosurgeons, cardiologist, hematologist, and others for multiple evaluations for her child with the purpose to identify what conditions and impediments the child has and how to treat them, including but not limited to his epilepsy.

81. K.M.H. has an epileptic disorder, a metabolic disorder, and risk of other conditions as a consequence of the negligent care before, during, and after the extraction/delivery process.

82. Karina still continues visiting multiple specialists for her baby to receive treatment for his diverse medical conditions that result as a consequence of the medical malpractice by the defendants during the birth.

83. As a consequence of the medical malpractice of co-defendants, K.M.H. suffered peri and post-partum permanent and catastrophic injuries.

84. As a consequence of the medical malpractice of co-defendants, Karina's life has been catastrophically and permanently affected.

**FIRST CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLE 1536 & 1540 OF THE PUERTO RICO CIVIL CODE AGAINST MENNONITE GENERAL HOSPITAL FOR NEGLIGENT CARE AT MENNONITE HOSPITAL AIBONITO (MHA)**

85. All the allegations previously exposed are incorporated by reference as if again fully set forth herein.

86. MGH has policies, protocols, procedures and/or requirements for the treatment of the departments of nursing, obstetrics, pediatrics, nursery and neonatal care, ICU, emergency, hospital, telemetry, intensive care, radiology and cardiology on its premises at MHA.

87. MGH provides medical and nursing treatment to birthing patients, like Karina and her baby, before, during, and after the birth at MHA.

88.  MGH contracted and/or afforded privileges to Dr. Carlene Cádiz, who, with assistance of the medical and nursing personnel, provided Karina with hospital care from February 21 to 24 of 2021 at Mennonite Hospital Aibonito.

89. MGH also contracted and/or gave privileges to the neonatologists, pediatricians and pediatric nurses who provided medical care to Karina's baby at Mennonite Hospital Aibonito (MHA) and Mennonite Hospital Cayey (MHC).

90. MGH obtains revenue from the services provided to their patients in the departments located at their facilities at MHA and MHC.

91. MGH is responsible for the medical malpractice that occurred in the hospital departments previously mentioned and that are located at their facilities at MHA and MHC.

92. MGH contracted, subcontracted, employed, provided privileges or in some way made the arrangements for Dr. Cádiz to provide evaluations and adequate medical treatment to Karina and her baby during the alleged period in this complaint at MHA and MHC.

93. Dr. Cadiz in addition to the personnel of MHA failed to assist Karina and her baby adequately in her birthing process.

94. MGH contracted, subcontracted, employed, provided privileges or in some way made the arrangements for Dr. Jesus A. Zayas (Dr. Zayas) to be the pediatrician on call on February 21, 2021.

95. MGH failed to ensure that Dr. Zayas or a qualified pediatrician be present when Karina's baby was extracted and needed immediate stabilization to prevent further brain damage.

96. MGH failed to have a pediatrician available to assist during the difficult birth of K.M.H and the evaluations, resuscitation and treatment that followed.

97. MGH failed to have a neonatologist or competent physician and hospital staff available to assist during the difficult birth of K.M.H and thus directly caused the failed stabilization and damages that resulted.

98. Dr. Cádiz and the personnel of MGH at MHA failed and incurred in negligence when they failed to perform the necessary diagnostic tests to obtain a proper diagnosis and once they had the convincing medical evidence, they failed by not providing the immediate medical treatment to assist Karina's baby during and after the birthing process.

99. MGH's personnel and Dr. Cádiz failed and incurred in negligence when they failed to promptly intervene promptly or adequately to prevent K.M.H.'s hypoxia, acidosis and respiratory distress.

100. MGH's personnel and Dr. Cádiz incurred in negligence when they failed to obtain informed consent from Karina for the labor induction, administration of induction medication, use of vacuum extraction as well as disregarded her requests to bear her baby through a cesarean section.

101. MGH and Dr. Cádiz incurred in negligence when carrying out Karina's delivery of her baby K.M.H., assisted by the "vacuum" in an inadequate manner and without the required informed consent.

102. MGH, among other deficiencies, failed and incurred in negligence by not providing adequate nursing care, including monitoring of the mother and child, and alerting obstetrician immediately that the patients were in distress or danger.

103.   The treatment offered by MGH to Karina and her baby K.M.H., through their medical personnel, nurses, technicians and/or physicians that are employed, are interns or have privileges to use their installations, was carried out below the medical standard of care that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching and, as such, directly caused and/or contributed to the serious health conditions and physical and mental impairments in the form of injuries to K.M.H. as described below.

104.   The personnel of MGH did not exercise the care and precautions required under the circumstances to prevent that Karina's baby K.M.H. be born without major complications, lacked the knowledge and the medical skill required to treat a pregnant patient and her baby, and could not timely have available the personnel and equipment necessary to avoid injuries, suffering, and the development of permanent medical conditions caused to the baby.

105.   The medical and hospital personnel of MGH negligently failed to provide Karina with competent medical and nursing personnel to evaluate, diagnose, monitor, detect, alert, treat and follow-up in a timely and appropriate way as soon as Karina and/or her baby showed and expressed great pain, suffering during the birth and right after the birth.

106.   The medical personnel at MHA, including the defendants in this complaint, negligently failed in treating Karina's baby after extraction assisted by "vacuum", who was suffering lack of oxygen, acidosis, hypoglycemia that

needed immediate stabilization, or would cause him further brain and multiorgan damage.

107.  Dr. Cádiz and the personnel of MHA failed and incurred in negligence when they failed by not providing the immediate medical treatment to assist Karina and her baby after the birthing process.

108.  MGH's personnel at MHA and Dr. Cádiz failed and incurred in negligence when they failed to intervene promptly during the birthing and afterwards to stabilize Karina's baby serious conditions.

109.  MHA and Dr. Cádiz incurred in negligence when carrying out Karina's delivery, assisted by the "vacuum" in an incorrect manner and after multiple attempts.

110.  MHA, among other deficiencies, failed and incurred in negligence by not providing adequate nursing and nursery care, including monitoring of the mother and child, and alerting medical personnel immediately that the patients were in distress or danger.

111.   The treatment offered by MHA to Karina and her baby, through their medical personnel, be they nurses, technicians and/or doctors that are employed, as interns or having they had privileges to use their facilities, was carried out below the medical standard of care that satisfies the general demand recognized by the medical profession in light of the modern means of communication and teaching and, as such, directly caused and/or contributed to the health conditions and physical impairments, as described below.

112.   The personnel of MHA did not exercise the care and precautions required under the circumstances to prevent that Karina's baby be born without mayor complications, lacked the knowledge and the medical ability required to treat a pregnant patient and her baby, and could not opportunely provide the adequately trained personnel and necessary equipment to avoid damage, suffering, and the development of permanent medical conditions.

113.   The medical personnel at MHA, including the defendants in this complaint, failed negligently in treating Karina's baby, who was untimely treated, improperly resuscitated, improperly stabilized after an extraction assisted by "vacuum" all which caused him to develop serious and permanent medical conditions that will follow him for the rest of his life.

114.   The nursing and medical personnel of MHA did not use available methods to alert, prevent, diagnose, and promptly treat Karina's child, who developed serious medical conditions as a result.

115.   Karina and her baby required a closer medical and nursing supervision, but instead were brought delayed and inadequate treatment during the birth process and afterwards at MHA.

116.   At all pertinent times, the MGH, their directors, officials, and doctors with privileges were negligent when failed to follow its protocols and provide the adequate medical attention to Karina and her baby, due to not providing competent  medical and nursing personnel, Dr. Cádiz, and other unknown doctors and residents employed by and/or practicing at MHA, and for not

exercising just care and precaution necessary to avoid physical, emotional damages and the suffering of the plaintiffs.

117.   MGH is liable for failure to provide, disclose, or enforce proper protocols to ensure proper care by doctors in the treatment of patients such as Karina and K.M.H. including but no limited to those regarding induction of labor and vacuum assisted deliveries.

118.   MGH is liable for failing to adequately supervise or monitor physicians practicing in their premises in order to prevent negligence in the treatment provided by them to Plaintiffs.

119.   As a result of what has been previously stated, MGH at MHA deceived those who were looking for adequate hospital care and thought they would receive adequate medical and nursing treatment.

120.   MHA did not provide timely services of people capable of coordinating their departments in an adequate and effective manner, and providing them adequate nursing attention, stabilizing care, as well as diagnostic studies to Karina's baby.

121.   As a direct and immediate result of MGH's lack of supervision and lack of properly trained and/or coordinated personnel of MHA in their labor, nursery, pediatric, hospital rooms, neonatal intensive care unit (NICU), intensive care unit (ICU), and the departments of gynecology and obstetrics negligently caused the child of the plaintiff to develop medical conditions that will follow him the rest of his life and the medical assistance he will need for life to attend them.

122. As a direct and immediate result of MGH's failure to properly coordinate the departments and necessary intervention by it personnel, plaintiffs suffered the damages as described below.

123. As a direct and immediate result of MGH's failure to properly obtain informed consent, it failed to respect the patient's autonomy, her specific requests for C-section and thus committed battery against Karina and her baby, all of which contributed to the damages described below.

124. Under Articles 1536 and 1540 of the Civil Code, MHA is responsible for the negligent acts and omissions of their personnel, agents, employees, and subcontractors, according to those described here.

## SECOND CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLES 1535 & 1540 AGAINST DR. CARLENE CÁDIZ AND THE MEDICAL PERSONNEL OF THE MENNONITE HOSPITAL OF AIBONITO

125. All the allegations previously expressed are incorporated by reference and are made part of the following allegations.

126.  At the moment of the described incidents in this complaint, Dr. Cádiz was the doctor in charge of bringing medical care while Karina was giving birth to her child.

127. The treatment offered by the defendants Dr. Cádiz and the personnel of MHA was under the medical standard that satisfies the expectations generally recognized by the medical profession in light of modern means of communication and teaching and, as a result, caused direct and/or contributed to causing severe hypoxic encephalopathy to Karina's baby, in addition to the damages stipulated by the plaintiffs, according to what is further described.

128. The defendants, Dr. Cádiz and the rest of the personnel of the MHA, negligently failed to provide the competent medical treatment to be able to assist Karina in the delivery of a healthy baby.

129. The defendants, Dr. Cádiz and the personnel of MHA did not exercise the care and precautions required, under the circumstances, to prevent that Karina's baby be born with complications.

130. The defendants, MHA and Dr. Cádiz, in this case, failed negligently in providing adequate medical care to Karina, who went to the hospital to give birth to her baby, causing the child to develop severe metabolic acidosis, hypoxic encephalopathy, brain hemorrhage, and multiorgan damage.

131. As a direct and proximate cause of the defendants Dr. Cádiz and MHA and/or other possible individuals who caused damages, including lack of adequate and immediate treatment of Karina and K.M.H., the plaintiffs suffered damages, including emotional, mental, physical, and economic damages, in accordance to what is described in this complaint.

**THIRD CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLE 1536 & 1540 OF THE PUERTO RICO CIVIL CODE AGAINST INSURANCE COMPANIES**

132. All claims set forth above are incorporated by reference and made a part of the following allegations.

133. From information and belief, at the time of the events described herein, insurers A, B, C, because their names are unknown, also insured the named defendants and the unknown at the moment.

134.   From information and belief these co-defendants issued liability insurance policies civil and/or negligence due to medical/hospital malpractice in favor of one or more of the co-defendants.

135.   According to 26 L.P.R.A § 2001, an injured party has a direct cause of action against a insurance company, due to the fault or negligence of the insured.

136.   According to 26 L.P.R.A. § 2003, an action against an insurance company, for the fault or negligence of your insured may be brought separately or jointly with the action in against the insured.

137.   For this reason, co-defendant A, B, C is jointly and severally liable for damages caused to the Plaintiffs, and their child, by the co-defendants described above and/or any other named defendant at the time.

## <u>FOURTH CAUSE OF ACTION AGAINST THE CONJUGAL PARTNERSHIP I-X</u>

138.   All claims set forth above are incorporated by reference and made a part of the following allegations.

139.   By information and belief, at the time of the events described herein, the doctors co-defendants were married and had a conjugal partnership with their respective wives or husbands, who because their names and surnames are unknown are referred to herein as Doe-Roe Conjugal Partnerships I-X

140.   The acts carried out by the defendant doctors were for the benefit of conjugal partnership composed of these and their wives or husbands John Doe and James Roe.

141.    For this reason, the co-defendants Doe-Roe Conjugal Partnerships I-X and each of the defendant doctors, are jointly and severally responsible for the damages caused by the doctors sued to the plaintiffs.

## DAMAGES

142.    All claims set forth above are incorporated by reference and made a part of the following allegations.

143.    As a direct and proximate result of the acts or omissions of all co-defendants, K.M.H., the child of the plaintiff, has permanent brain damage and as a result will suffer debilitating physical and mental deficiencies caused by birth trauma and its aftermath.

144.    As a result of professional negligence, lack of experience, fault and inexperience of all the co-defendants, Karina, will have to care for her permanently damaged child for the rest of her and his life.

145.    As a result of defendants' professional negligence, lack of experience, fault and inexperience of all Co-Defendants, Plaintiffs' quality of life has been affected seriously affected.

146.    Karina Hernandez has suffered greatly and will continue to suffer from the permanent impairments of K.M.H., and who will need her special care in all phases of his life.

147.    As a direct and proximate result of the co-defendants' negligence, Karina Hernandez will no longer have the pleasure of seeing her child grow up and lead a normal life.

148.    As a direct and proximate result of the Co-Defendants' negligence, K.M.H. suffers of severe hypoxic encephalopathy and epilepsy, for which he will never become an adult or be able to fend for himself.

149.    As a direct and proximate result of the Co-Defendants' negligence, K.M.H. has permanent brain damage that will prevent him from having a normal life, being fully physically developed, from ever becoming self-sufficient individual but instead will force K.M.H. for the rest of his life to depend on his mother and others, such physical damages are valued at no less than **FIVE MILLION DOLLARS ($5,000,000).**

150.    The negligent acts and omissions of the Co-Defendants have directly caused Karina Hernandez intense emotional pain and suffering and frustration, and a grave sense of injustice valued at no less than **THREE MILLION DOLLARS ($3,000,000).**

151.    The negligent acts and omissions of the Co-Defendants have directly caused Karina Hernandez's life to be upended since her baby was born and for the rest of her life, will be his direct and indirect caregiver, preventing her from life's enjoyment, from developing or pursuing her work career and having any type of normal life, which has also affected her ability to earn the wages she would have had her son been spared the permanent disabilities for a value, all of which has a value of no less than **TWO MILLION DOLLARS ($2,000,000).**

152.    The co-claimants, individually or jointly, will have to bear additional expenses such as doctors, hospitals, care, special education, special equipment, medication, special facilities, adapted living quarters, special transportation,

that K.M.H will require for his severe physical and mental disability, for the rest of his life. This has an approximate value of not less than **THIRTEEN MILLION DOLLARS ($13,000,000).**

## **TRIAL BY JURY DEMANDED**

155.    Plaintiffs demand trial by jury on all causes of action herein raised.

   **WHEREFORE**, Plaintiffs demand that judgment against the DEFENDANTS be entered, finding them to be jointly and severally liable to Karina and K.M.H. for an amount of no less than **TWENTY THREE MILLION DOLLARS**, as well as costs and attorneys' fees and such other relief as this Honorable Court may esteem to be just and proper under the circumstances.

   **RESPECTFULLY** submitted on this 17th day of April, 2023.

**INDIANO & WILLIAMS, P.S.C.**
Attorneys for Plaintiffs
207 Del Parque St., Third Floor
San Juan, Puerto Rico 00912
Tel: (787) 641-4545
Fax: (787) 641-4544
jeffrey.williams@indianowilliams.com
vanesa.vicens@indianowilliams.com

**s/ Jeffrey M. Williams**
Jeffrey M. Williams
USDCPR Bar No. 202414

**s/ Vanesa Vicéns--Sánchez**
Vanesa Vicéns-Sánchez
USDCPR Bar No. 217807
